# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Assessment and Training Solutions ) | ASBCA No. 61047 |
| Consulting Corporation ) | |
| ) | |
| Under Contract No. H92240-14-P-0155 ) | |

APPEARANCE FOR THE APPELLANT:     James S. DelSordo, Esq.
                                                                  Argus Legal, PLLC
                                                                  Manassas, VA

APPEARANCES FOR THE GOVERNMENT:     Jeffrey P. Hildebrant, Esq.
                                                                           Air Force Deputy Chief Trial Attorney
                                                                           Phillip E. Reiman, Esq.
                                                                           Lt Col Nathaniel H. Sears, USAF
                                                                           Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

This appeal arises out of a Navy contract to lease three boats to be used in maritime training. Assessment and Training Solutions Consulting Corporation (ATSCC) claims $57,596.01 for damage to two of the boats. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We sustain the appeal in the amount of $50,637.08 and deny the rest. Appellant has elected to proceed under Board Rule 12.3.

## SUMMARY FINDINGS OF FACT

1. Contract No. H92240-14-P-0155, dated 31 March 2014, was awarded by the Naval Special Warfare Command (Navy), Norfolk, Virginia, to ATSCC to lease 3 boats for 12 months with options to extend each by 6 months (R4, tab 1 at 4-10). The base period of performance was from 31 March 2014 to 30 March 2015 (*id.* at 12-13). The boats were to be delivered to San Diego Harbor, California, Little Creek Harbor, Virginia, and Pass Christian Harbor, Mississippi (*id.* at 4-6*)*. The contract value was $718,000.00 (*id.* at 13).

2. The Performance Work Statement (PWS) stated that the three vessels were to be used "in support of Master Mariner training program" (R4, tab 7 at 1). The PWS included the following maintenance requirements:

> Contractor will perform quarterly preventative maintenance on all three craft to include both hull, mechanical, and electrical systems. The cost of such maintenance shall be borne by the

> contractor. Additionally, quarterly maintenance inspections
> shall be performed on all three craft to identify any actual or
> pending maintenance failures that could potentially degrade or
> compromise the safe and efficient operation of the vessel.
> Identified repairs shall be affected [sic] within a ten day period,
> pending availability of necessary repair parts. The contractor
> shall bear the cost of performing repairs *unless it can be proven*
> *that such repairs were due to negligence or willful damages*
> *caused by the government.*

(*Id.* at 2) (Emphasis added) The PWS did not require that the Navy fill out pre- and post-operation checklists or engine logs during operation (tr. 1/83; R4, tab 7).

3. An engine survey was conducted on 14 April 2014 on one of the boats, the Free Spirit (FS), a 57-foot Viking Yacht Sportfish (R4, tab 84; app. supp. R4, tab 2). Contrary to the Navy's assertion in its reply brief that ATSCC "never disclosed the 14 April 2014 engine survey" to the Navy (gov't reply br. at 2), the engine survey report was in a "big packet" of material onboard FS when the Navy did its initial walkthrough (tr. 1/137-38). The Navy agrees that it inspected the FS before use (gov't br. at 5). The survey indicated that overall performance of the engines was "good" (R4, tab 84 at 7). The survey included a "Test Trial" that indicated the port engine was operating within specified requirements (*id.* at 8). The survey identified twelve deficiencies in the port engine including "scuffing and scouring present on the random cylinders inspection" and a lack of service history (*id.* at 10). Mr. Taylor is the Chief Engineer, Special Warfare Group 4 (tr. 1/179). The Board recognized Mr. Taylor as an expert in diesel engines (tr. 1/182). Mr. Taylor reviewed the survey. He explained that an exhaust manifold directs exhaust from the combustion cylinders to the turbo charger (tr. 1/185). The manifold is cooled by treated distilled water or "coolant" (tr. 1/186). Mr. Taylor testified that the FS's 25-year old Detroit Diesel engine's condition depends upon the quality of the maintenance over the years (tr. 1/197). Concerning the survey and the 25-year old diesels, he testified that "everything wears a little bit" but with proper maintenance the boat should operate normally (tr. 1/184, 197). Conversely, if the engines are poorly maintained "you have trouble" (tr. 1/197). The previous owner's maintenance records for the FS were not available during the survey (tr. 1/190). Mr. Taylor questioned the maintenance history based on his observations (tr. 1/191). Mr. Janota is the vice president of ATSCC (tr. 1/40). He testified that he talked to the previous owner and saw some maintenance records/logbooks and was satisfied the FS had been maintained (tr. 1/115). In its reply brief the Navy contends, "the engines were in such poor condition the mechanic refused to warranty his repair work" (gov't reply br. at 2). This is a misrepresentation of the record. The handwritten statement on the invoice read, "Note: This is a high horse power unit and full overhaul was not performed therefore this repair has no warranty expressed or implied" (R4, tab 95 at 2). Thus, the reason there was no warranty was because the mechanic did not do a full overhaul, not because the engines "were in such poor condition."

2

4. On 14 April 2014, ATSCC and the Navy signed a "Bareboat Charter Agreement" for "La Buena Vida" (LBV) a 1988 62-foot Halvorsen Convertible (app. supp. R4, tab 1). The charter required that the Navy fill out pre- and post-operation checklists (*id.* at 3). Mr. Bell signed for ATSCC and Mr. Chad Fishell signed for the Navy (*id.*). Mr. Bell had authority to enter into contracts for ATSCC (tr. 1/132). Mr. Fishell was the captain of the boat at delivery and did not have authority to enter into contracts for the Navy.[1] LBV was approximately 29 years old (R4, tab 72 at 1).

5. On 18 April 2014, ATSCC and the Navy signed a "Bareboat Charter Agreement" for FS (app. supp. R4, tab 2). The charter required that the Navy fill out pre- and post-operation checklists (*id.* at 6). Mr. Hagerman signed for ATSCC and Mr. Overley signed for the Navy (*id.*). Mr. Hagerman had authority to enter into contracts for ATSCC (tr. 1/132). Mr. Overley was the captain of the boat at delivery and did not have authority to enter into contracts for the Navy.[2] FS was approximately 27 years old (R4, tab 71 at 1, tab 74 at 2).

6. Mr. Janota testified the bareboat charter agreements were provided by ATSCC to the boat captain "so that they would have something to show the Coast Guard when the Coast Guard pulled them over" (tr. 1/67; app. supp. R4, tabs 1-2). Mr. Janota did not intend the charter agreement to alter the contract with the Navy (tr. 1/84, 129).

7. Sometime before 21 April 2014, the FS ran aground while being operated by the Navy (R4, tab 85 at 2). On 21 April 2014, ATSCC had the FS hauled out for repairs occasioned by the grounding (tr. 1/100). ATSCC paid Progressive Marine Service, St. Petersburg, Florida, $12,487.32 for the repairs (tr. 1/99-102; R4, tab 85 at 4-6). The Navy and ATSCC failed to reach agreement and the Navy did not pay ATSCC $12,487.32 in 2014 (tr. 1/100). Later in June 2015 the Navy paid ATSCC $7,428.93 for the bent shaft, missing propeller, and a shore power cord from the grounding (R4, tab 6).[3]

8. Mr. Graham, ATSCC "representative," sent a "Vessel Status Report for September, 2014" to Michael Rose, "Naval Special Warfare" (app. supp. R4, tab 13). One of FS's engines would not turn over. Troubleshooting the engine found water in the top of the number 6 piston which was attributed to a cracked head, leaking exhaust manifold, or

---

[1] The government put no evidence on the record that Mr. Fishell had contracting authority and Air Force counsel stated, off the record, that he did not and we find he did not.

[2] The government put no evidence on the record that Mr. Overley had contracting authority and Air Force counsel stated, off the record, that he did not and we find he did not.

[3] The record is confusing regarding the grounding in 2014. The 21 April 2014 invoice for $12,487.32 was from Progressive Marine Service, St. Petersburg, Florida (R4, tab 85 at 6). The $7,428.93 invoice for repair of the bent shaft and missing propeller "from grounding" is dated 23 April 2015 and is from Kennedy Marine, Gulfport, Mississippi (R4, tab 3). There is no evidence of grounding in 2015. The record provides no explanation.

3

leaking injector. ATSCC hired Johnson's Diesel Service to make the repairs and on 29 September 2014 "[a]fter several repairs" FS got underway and ran well. (*Id.* at 2) The invoice from Johnson's Diesel indicates the repairs took place from 10 to 30 September 2014 and that port engine cylinders Nos. 5 & 6 were replaced, a bent rod on cylinder No. 6 was replaced and an exhaust manifold was cracked. A new manifold could not be used because of a design change but the mechanic found a "good used manifold" and installed it on the port engine.[4] Prior to the sea trial the mechanic found that the wrong oil was used, "customer was using 15-40w oil which is incorrect for a 2 stroke 40w only," however, it is unclear what affect this had on the engines. The mechanic wrote that because he did not perform a full overhaul there was no warranty of the work. The total invoice for parts and labor was $12,134.80. (App. supp. R4, tab 8 at 2) Three engine logs before the September 2014 failure indicate the Navy operated the FS when the port engine was overheated (temperature greater than 205) on 21, 22, and 23 July 2014 (R4, tab 76 at 11, 17, 23). There is nothing on the logs that indicates the high temperature alarm sounded. Mr. Taylor agreed that the port engine was running hot and at temperatures of 220 or above damage to the engine could occur (tr. 1/211, 233). ATSCC did not ask the Navy to reimburse it for the repair and the cost of these repairs is not in ATSCC's claim (tr. 1/54).

9. In December 2014, the FS underwent "lengthy yard service" including tuning the port engine, flush coolant system and add new coolant, and replacing various parts. After the service, FS conducted "a sea trial with notable improved performance." (App. supp. R4, tab 16 at 1-2)

10. In January 2015, the FS underwent repairs that included an acid wash of the port engine coolant and addition of new coolant. The report did not identify that any problems were found. (App. supp. R4, tab 17 at 2)

11. In the February 2015, Vessel Status Report, ATSCC reported the following discrepancy for the FS:

> Port Engine - The port engine has a steady oil leak and requires oil to be added before every underway. There is a significant amount of light grey smoke coming out of the port exhaust when the engine is at idle and while underway. It is recommended that a certified mechanic be hired to address the issue.

(App. supp. R4, tab 18 at 3)

---

[4] There are two manifolds on the engine (app. supp. R4, tab 4 at 2) but the invoice does not identify which one was replaced (app. supp. R4, tab 8).

4

12. The March 2015 Vessel Status Report indicates the following for the FS:

> Port engine - per the mechanic, most of the smoke that is
> being seen while underway is steam (after looking at the
> video that was sent to me). There is some smoke coming
> from the engine, but with the age, it is normal. There are a
> couple of ways to improve the smoke like rebuild the
> injectors. With the oil leaking around the engine, Port and
> Starboard Sea water pumps have a slight leak and new seals
> are needed. Blower Hub Oiler on Port side has a leak
> coming from the o-ring, needs to be replaced. Portside Air
> box muddler - pressure bolt was too long allowing oil to roll
> out. New bolt was replaced and oil was stopped[.]

(App. supp. R4, tab 19 at 4) The April 2015 Vessel Status Report indicates, "The port engine injectors are in and will be installed on Tuesday" (app. supp. R4, tab 20 at 2).

13. On 18 March 2015, the Navy exercised the options for an additional six months adding $354,000 to the contract (R4, tab 2).

14. Except for a "minor oil leak in the [FS] engine room" reported in the May 2015 Vessel Status Report, there were no other problems reported for the FS in the May, June and July 2013 reports (app. supp. R4, tabs 21, 22).

15. On 11 June 2015, ATSCC submitted a Request for Equitable Adjustment (REA) for $7,428.93 in damages to the FS (R4, tab 3). The damage was a bent shaft, shore power cord repair, and missing propeller caused by "grounding" the vessel (*id.* at 1). The Navy reviewed the REA and concurred with the cost of the repairs (R4, tabs 4, 8). Modification No. P00003 paid ATSCC the requested $7,428.93 for the repairs (R4, tab 6).

16. The record includes various checklists and engine logs for the FS. The PWS did not require log books be maintained (tr. 1/83; R4, tab 7); however, the Navy did fill out checklists and some logs. Mr. Bell, ATSCC program manager, testified that pre- and post-operation checklists ensure everything is in order before getting underway and engine logs are filled out during operation and document, among other things, engine coolant temperature (tr. 1/12, 26). The pre-operation checklists from the date of the repair of the port engine on 29 September 2014 to the port engine overheating on 6 August 2015 indicate that the port engine oil and coolant were checked before every use of the FS and oil and coolant was added if necessary (R4, tabs 9, 33, 45, 47, 52, 57, 60, 75-81).[5] According to the checklists, the FS was operated 38 days between 29 September 2014 and 6 August 2015 (R4, tabs 9, 45, 47, 52, 57, 60, 78-81). Only 13 of the 38 days included filled-out engine logs (R4, tabs 45, 47, 52, 78-80). The only

---

[5] There is nothing in the record to establish if these are all the checklists for the FS or not.

explanation was that the Navy does not require that engine logs be filled out on commercial vessels (tr. 1/216). All of the engine logs showed that the port engine was operated at a proper temperature (below 205 degrees)[6] (*id.*). The last filled out engine log is for 27 May 2015 (R4, tab 52 at 34). There are no engine logs for June and July 2015 in the record. There is no engine log for the 6 August 2015 trip to Kennedy Marine when the port engine overheated (R4, tab 9). At the end of September 2014 the port engine had 1548 hours of operation (app. supp. R4, tab 22 at 1). The 6 August 2015 post-operation checklist for the FS documents that the port engine had 1725.3 hours of operation (R4, tab 9 at 6). Therefore, the FS port engine accumulated 177.3 hours of operation between 29 September 2014 and 6 August 2015. Mr. Janota testified that 90 hours of operation was low for the engines (tr. 1/126). We infer that 177.3 hours is likewise not an excessive amount of hours.

17. On 5 August 2015, Special Boat Chief (SBC) Alb sent an email to CWO3 Greenleaf, FS training officer (tr. 1/157), stating, "Mechanic called me. Viking may have a cracked manifold in the Port engine." (R4, tab 69 at 2) "Viking" refers to the manufacturer of the FS (tr. 1/160-61). The "mechanic" was Kennedy Marine (tr. 1/161, 167). SBC Alb explained that they ran the FS to get it to Kennedy Marine because they were not sure the manifold was in fact cracked and Kennedy recommended that the Navy take it to Kennedy for repair if needed (tr. 1/162, 167-68).

18. SBC Alb was a trainer on the FS on 6 August 2015 (tr. 1/141). According to SBC Alb's declaration, on 6 August 2015 the Navy was returning the FS to ATSCC for "repairs because there was an active 'discrepancy report' from the previous month noting that the port engine had a large oil leak from the engine and was continuously losing coolant" (R4, tab 71 at 2). The pre- and post-operation checklists before 6 August 2015 do not indicate that the FS was "continuously losing coolant" (R4, tabs 9, 45, 47, 52, 57, 60, 78-81). SBC Alb recalled that he was told that port engine was "continuously losing coolant," but he had no personal knowledge and could not explain why the checklists did not document such a problem (tr. 1/170-72). On 6 August 2015, the FS was "underway" during a 50 nautical mile trip from Gulfport, Mississippi, to Kennedy Marine Boat Yard, Gulfport, Mississippi (R4, tab 9). SBC Alb testified that when the FS was underway the crew conducted hourly spot checks of the engine room "which ensures that shafts were operating well, there is no water entering the bilge and ensuring that there is no oil leaking from the engines and transmissions" (R4, tab 9 at 1). The crew had a "green log book, captain style log book, on the vessel in which the guys would do a visual inspection of the engine room every hour" (tr. 1/153). SBC Alb testified that although he did not fill out the log books himself, they were required to be filled out anytime the vessel would get underway (tr. 1/154). No engine logs were entered into the record after 27 May 2015 (R4, tab 52 at 34) even though SBC Alb testified they would be kept in the training department. Mr. Gino "Magaroni" (signature

---

[6] Mr. Bell and Mr. Taylor testified that the normal operating temperature is around 180 degrees (tr. 1/18, 209).

hard to read) filled out Pre-Operational and Post-Operational checklists for 6 August 2015 (R4, tab 9 at 2, 6). The Pre-Operational engineering checklist indicated mechanicals such as oil level, coolant, transmission, belts, etc. were acceptable. There is no requirement to check coolant or oil levels on the post-operation checklist. (*Id.* at 6) A note on the Post-Operational engineering checklist read, "Upon arrival port engine temp alarm was going off. Port engine shut down." (*Id.* at 7) SBC Alb recalls that as they approached Kennedy Marine the port engine alarm went off (tr. 1/145-46). They shut the port engine down immediately and used the good engine to moor the boat (tr. 1/146). SBC Alb testified that they did not "experience high operating temperatures in the engine" before they arrived at Kennedy Marine (tr. 1/151). He explained that once the engine hits high temperature the alarm goes off and that is a signal to the crew to shut the engine down (tr. 1/151).

19. The FS was inspected by Kennedy Marine on 7 August 2015. Mr. Kennedy reported that the rear outboard manifold[7] was cracked allowing coolant water to leak into the oil sump, and wrote, "We could not find any signs of the engine loosing water externally that would cause the manifold to crack." (App. supp. R4, tab 3 at 2) In a 25 August 2015 "Port engine exhaust manifold service report," Mr. Kennedy wrote in part, "We found nothing in the performance of the engine to cause the manifold to crack other than the engine had no coolant water" (app. supp. R4, tab 4 at 2). In an 11 September 2015 email to ATSCC, Mr. Kennedy reported that as they were repairing the manifold they found broken rings on two port engine cylinders and estimated it would take six days to repair (app. supp. R4, tab 3 at 1). Mr. Taylor, the Navy's diesel engine expert, testified that it is impossible to know when the crack in the port engine manifold started to form and that it could have been there for a long time (tr. 1/201, 234-35).[8]

20. On 17 September 2015, Mr. Hagerman, ATSCC, notified LCDR Macaskill, USSOCOM, that on 11 September 2015 "several hundred gallons of diesel fuel had been pumped into one of [LBV's] freshwater tanks by NSW personnel, and that it had been pumped through the vessel's lines" (R4, tab 68 at 2).

21. On 15 December 2015, ATSCC submitted to the Navy contracting officer a $57,596.01 claim for damage to two boats, the LBV ($16,210.13) and the FS ($41,385.88) caused by "the negligence of U.S. Government (USG) personnel" (R4, tab 11 at 1-2). The damage was identified in the claim:

---

[7] Because the records of the September 2014 replacement of a manifold with a used manifold do not identify which one (app. supp. R4, tab 8), we do not know if this failure involved the used manifold or not.

[8] Mr. Taylor's expert testimony included a lot of speculation such as that the 2014 repair installing a used manifold could be the source of the problem or even that a previous owner could have operated the engine in an overheated condition (tr. 1/203-07). That is the problem with his testimony, much of it is speculation and we can only give it limited weight.

7

| La Buena Vida | |
|---|---|
| Propeller Damage | $1,937.00 |
| Hull & Rub Rail Damage | $3,593.70 |
| Hull Buff & Wax Due to Hull Damage | $1,000.00 |
| Water Tank | $5,325.00 |
| Davit | $1,072.50 |
| Detailing (Interior & Carpets) | $1,720.00 |
| Haul, Block, Launch & Wash | $1,447.20 |
| Misc Materials | $37.48 |
| Sales Tax (8%) | $77.95 |
| Total | $16,210.[8]3 |

| Free Spirit | |
|---|---|
| Manifold | $12,797.90 |
| Ring Job | $26,847.98 |
| Detailing | $1,740.00 |
| Total | $41,385.88 |

ATSCC stated that it took responsibility for some repairs having paid $29,633.23 for the LBV and $167,592.34 for the FS (*id.*). The $1,937.00 invoice for the LBV "propeller damage" read "R & R props for tune and balance" (*id.* at 4). SBC Rose testified in his declaration that tuning and balancing a propeller could be done to improve performance and fuel economy and was not for repairing damage to the propeller (R4, tab 82 at 3). An inspection report dated 21 June 2016 indicates that the damage to the LBV port bow "occurred while docking the boat in windy conditions, with the port bow striking the concrete pylon at the dock" (app. supp. R4, tab 006 at 1). The Navy had "conducted basic fiberglass repair of the area and then boat was moved by Navy crew to Driscoll's Boat yard in the afternoon for feather/prime, paint and replacement of rub rail" (*id.*). The record includes pictures of the damage and repair (*id.* at 2-3). The $3,593.70 invoice stated, "Paint repairs to port hullside and rub rail from 2nd port light aft to 4″ vent fwd" (R4, tab 11 at 4). The invoice for the davit repair indicates "davit cable appeared to have been cut"[9] (*id.* at 6).

22. The Navy failed to issue a final decision on the 15 December 2015 claim for over a year. ATSCC appealed to this Board based on a deemed denial on 6 February 2017. We docketed the appeal as ASBCA No. 61047 on 7 February 2017. ATSCC elected to have the appeal decided pursuant to Rule 12.3 accelerated procedure on 7 April 2017.

---

[9] The electronic version of the invoice is mostly illegible, however, the copy of the claim attached to the notice of appeal is legible.

## DECISION

We decide both entitlement and quantum. The Navy does not contest the dollar amounts claimed by ATSCC. We verified that the dollar amounts are supported by the invoices in the record.

The parties signed Contract No. H92240-14-P-0155 (contract 0155) to lease three boats (finding 1). Contract 0155 required ATSCC to provide quarterly inspections and maintenance at ATSCC's expense unless the repairs were caused by the negligence of the government (finding 2). The parties also signed bareboat charter agreements for the LBV and FS[10] but the signers for the Navy did not have authority to enter into contracts for the Navy (findings 4-5). Therefore, these are not binding contracts. *D&F Marketing, Inc.*, ASBCA No. 56043, 09-1 BCA ¶ 35,108 at 168,774 (must have actual authority to bind government in contracts). We disagree with ATSCC's argument that the charters are binding "maritime" contracts based on "admiralty law" (app. br. at 6). The bareboat charters, although not bilateral contracts, were primarily for the benefit of the Coast Guard should the boats be stopped and inspected (finding 6).[11] Since the charters are not binding contracts, we need not deal with them further in this decision.

ATSCC argues that the nature of the damage, especially the engine damage, is sufficient to prove negligence on the part of the Navy (app. br. at 5). Contrary to ATSCC's argument, the record does not "clearly show" that the Navy operated the vessels negligently (*id.*). ATSCC failed to prove that the claimed damages were caused by the Navy's negligence. One would expect that finding to resolve the appeal in favor of the Navy. However, ATSCC points to common law bailment and argues that it may rely on a presumption to meet its burden of proof (*id.*). The Navy argues that since "negligence is specifically addressed in the PWS, common law bailment principles are inapplicable to ATS' claim" (gov't br. at 11). ATSCC is correct.

ATSCC relies on *Mohammad Darwish Ghabban Est.*, ASBCA No. 51994, 00-2 BCA ¶ 31,114 for the proposition that when the government rents property from a contractor, a bailment for the mutual benefit of the parties is created. *Id.* at 153,671. The law of bailment imposes upon the bailee the duty to protect the property by exercising ordinary care and to return the property in substantially the same condition, ordinary wear and tear excepted. *Id.* When the government receives the property in good condition and returns it in a damaged condition, a presumption arises "that the cause of the damage to the property was the Government's failure to exercise ordinary care or its negligence." *Mohammad Darwish*, 00-2 BCA ¶ 31,114 at 153,672; *International Automotriz*, ASBCA No. 59665, 15-1 BCA ¶ 36,174 at 176,513. However, when the parties enter into an express written contract, the rights and obligations of the parties are

---

[10] The third boat is not relevant to this appeal.

[11] There are no inconsistencies between the language of the Charter Agreements and
  Contract 0155, Navy liability under both is essentially based on negligence.

determined by the provisions of the contract. *Mohammad Darwish*, 00-2 BCA ¶ 31,114 at 153,672. In this case, contrary to the Navy's argument, the criteria for government liability are the same under the common law of bailment and the express contract – negligence. The Board has applied the common law presumption when an express written contract exists if the common law is consistent with the written contract. *Id.* at 153,672 (we construe the language used here as no more than an expression of the common law liability of the bailee). In *Mohammad Darwish* the Air Force rented a road grader. It was received used but in operating condition but was returned with a blown engine. The arguments are remarkably similar to this appeal:

> Appellant has offered a technical report which we found credible stating that the damage to the engine was caused by high temperature resulting from a lack of water and oil and that there was no indication of a latent defect in the "inner parts" of the engine. The Government has offered the operator's statement that the oil level was full and Capt Langer's memorandum. The Government did not conduct an independent evaluation to assess the likely cause of the damage. Moreover, it has not offered any evidence that it performed routine maintenance on the grader during the period of the lease other than the statement that Air Force personnel checked the fluid levels on the grader daily. Under these circumstances, we conclude that the Government has not rebutted the presumption that the cause of the damage was its failure to exercise ordinary care in operation of the equipment and that it is liable for the resulting damage.

*Mohammad Darwish*, 00-2 BCA ¶ 31,114 at 153,672. The Board sustained the appeal.

We follow our analysis in *Mohammad Darwish*. The Navy relies heavily upon the engine survey, the fact that the FS was at least 25 years old, had no service history and, according to the Navy, was in poor condition (gov't br. at 12-13). The Navy argues, "ATS has not shown that it delivered an engine in good condition, and received the engine back in damaged condition, excepting ordinary wear and tear" (*id.* at 12). We disagree. It should be clear to anyone, including the Navy, that FS' "blown" engine is not "ordinary wear and tear." The Navy had access to the engine survey which was onboard the FS when the Navy did its initial walkthrough to accept the boat (finding 3). We find that the Navy is charged with knowledge of the survey when it accepted the FS. The survey indicated that overall performance of the engines was "good" and included a "Test Trial" that indicated the port engine was operating within specified requirements (*id.*). The Navy's diesel engine expert, Mr. Taylor, testified that properly maintained Detroit Diesel engines should perform properly. In the absence of maintenance records, Mr. Taylor's concern about the maintenance history of the FS's engines is largely speculation. (*Id.*) The Navy took possession of the LBV and FS in April 2014 (findings 4-5). There is nothing in the record

10

that leads us to conclude that the vessels were not in acceptable operating condition when delivered to and accepted by the Navy. There was no requirement that ATSCC provide new vessels. We find that the Navy's acceptance of LBV and FS establish that the vessels were in good operating condition when received. We also find that both boats had damage when returned by the Navy to ATSCC (finding 21).

The Navy argues that the common law presumption does not apply because the Navy did not have exclusive control of the FS and LBV. It bases this argument on ASTCC's obligation to preform quarterly preventive maintenance, yet states that ATSCC had "regular and frequent access to the vessels in order to perform and coordinate maintenance and repairs as required by the PWS." (Gov't reply br. at 4) We do not agree that ATSCC's obligation to maintain the vessels amounts to "frequent access" sufficient to avoid the presumption. The damage to the FS port engine occurred during Navy operations and training and ATSCC did not participate in the Navy's training. Accordingly there is a presumption that the damage was caused by the Navy's negligence. Now we consider if the Navy rebutted the presumption.

The burden of proof we routinely apply is preponderance of the evidence. *Benjamin Medina*, ASBCA No. 60289, 17-1 BCA ¶ 36,818 at 179-444 ("As with any claim against the government, the party seeking recovery must prove a causal connection between the damages alleged and the government by a preponderance of the evidence."). In an early bailment case relating to a shipment of government cargo, we imposed a preponderance of the evidence standard on appellant to overcome the presumption that the loss of cargo was caused by its negligence. *Export Packing Division of NOVO Corp.*, ASBCA No. 18376 *et al.*, 75-1 BCA ¶ 11,291 at 53,829-30. Accordingly, to overcome the presumption the Navy must prove that it was not negligent by a preponderance of the evidence. We explained this burden in *Jack Heller, Inc.*, ASBCA Nos. 14300, 14376, 72-2 BCA ¶ 9477:

> A "preponderance of the evidence," as we understand the sense in which the phrase is normally used, does not mean that a factual finding based thereon must be free of doubt. Rather, preponderance rests with that evidence which, when fairly considered, produces the stronger impressions, and has the greater weight, and, even though not free of doubt, is more persuasive as to its truth when weighed against evidence in opposition thereto. See Black's Law Dictionary, Third Edition. Thus, a balancing, or weighing, of the conflicting evidence must be performed by any fact finding tribunal before it can properly arrive at what constitutes the "preponderance of the evidence."

*Id.* at 44,147.

11

The parties presented very little evidence relating to the LBV at the hearing. We disagree with the Navy's suggestion that there is credible evidence that ATSCC's employees caused the damage to the LBV (gov't br. at 16). We accept SBC Rose's declaration testimony that tuning and balancing a propeller is not evidence of damage, but routine maintenance (finding 21). We deny this part of the claim. After looking at the pictures and other documents, we conclude that the damage to the bow is presumed to be caused by negligence, i.e., hitting a pier (*id.*). The Navy put on little evidence to rebut this presumption. We sustain this part of the claim for the claimed amount of $4,593.70. We sustain the $5,325.00 claim for the replacement of the water tank due to the Navy's putting diesel fuel in it. The Navy has not rebutted the presumption that damage to the davit was caused by its negligence and that part of the claim is sustained in the amount of $1,072.50. We deny the remainder of the claim for detailing, haul, launch and wash because we conclude this is routine maintenance due to fair wear and tear.

Concerning the FS, we deny the "detailing" claim because, aside from there being no evidence on it, we conclude it was not damage but cleaning necessitated by fair wear and tear. The parties spent almost all of their effort during the hearing dealing with the damage to the FS's port engine where the majority of the costs were incurred—$39,645.88. The port engine required a manifold replacement and ring job in August 2015 (finding 19). It is the Navy's burden to rebut the presumption that the engine damage was caused by its negligence. The Navy has proven various things. FS is approximately 27 years old (finding 5). The port engine was repaired in September 2014 to include replacing two cylinders, a bent rod and a cracked exhaust manifold (finding 8). This repair was similar to the one in September 2015. The exhaust manifold was replaced with a used one, but the record does not specify which of the two manifolds was replaced so we do not know if the manifold that was replaced in August 2015 was the used one installed in 2014. It would not make any difference to our decision if it was. Most significantly, the Navy placed into evidence many checklists that prove Navy personnel checked the oil and coolant in the port engine before every operation of the FS (finding 16). The post-operation checklist does not include a coolant level check. The problem we confront is that proving the FS's port engine had oil and coolant before operation does not prove what occurred during the operation. To rebut the presumption the Navy must prove it did not operate the engines at too high a temperature which will cause the manifold to crack over time. SBC Alb testified that Navy personnel would periodically check the engines during operation (finding 18). The engine log forms are for documenting such checks. The record only contains 13 engine logs for the 38 days of operation evidenced by the checklists between September 2014 and 6 August 2015. These logs do not show overheating in the port engine. However, the last engine log was for 27 May 2015, over two months before the 6 August 2015 failure. (Finding 16) There was no explanation why the engine logs were not routinely filled out as, according to SBC Alb, engine checks were being conducted hourly while under way and entered in a "green log book, captain style log book, on the vessel" (finding 18). In its brief the Navy affirmed that it conducted hourly engine inspections and filled out logs during operation:

12

When in regular use, the Navy conducted pre-operation inspections, post-operation inspections and regular underway inspections and recorded the inspection results in the boats' logs. (R4, tab 71 at 2).[12] Since this was a training environment, the Navy crews also conducted hourly engine checks under the supervision of their instructors. These checks entailed visually inspecting the engine room for any abnormal oil, or coolant and visually inspecting the gauges to ensure the engines were operating within normal parameters.

(Gov't br. at 5-6) This quote and SBC Alb's testimony begs the question where are the engine logs[13] and how could the Navy have operated the engines in an overheated condition in July 2014? The engine logs for 21, 22, 23 July 2014 indicate that the Navy operated the port engine in an overheated condition before the September 2014 failure (finding 8). These logs are actual evidence of Navy negligence that could have justified Navy liability for the September 2014 repairs. The engine logs after the September 2014 repairs are critical to the Navy's ability to rebut the presumption.

Although the FS was not heavily used in 2015, accumulating only 177.3 hours of operation before the 6 August 2015 port engine failure (finding 16), it is clear that running the engine while overheated can cause a manifold to crack (findings 8, 19). As stated above, the engine had been repaired in September 2014. The record evidences that ATSCC preformed other maintenance on the FS's engines in 2015. (Findings 9-14) We disagree with the Navy's argument that ATSCC neglected its maintenance obligations (gov't br. at 14-15).

We find that running the engine when it is overheating is the likely cause of the 2015 exhaust manifold failure/cracking and resulting "blown" engine (finding 8). Mr. Taylor testified it is impossible to know when the crack in the manifold began (finding 19). Therefore, it is likely that the manifold crack originated sometime between the September 2014 repair and 6 August 2015 failure. Based on Mr. Taylor's testimony, it is even possible that running the port engine while overheated during three days in July 2014 could contribute to the August 2015 failure (findings 8, 19). The Navy presented some evidence that it was not negligent. SBC Alb testified that the port engine did not overheat during the 6 August 2015 trip to Kennedy Marine until the very end of the trip (finding 18). If we accept SBC Alb's testimony as accurate in the absence of logs, it does not tell us if the Navy operated the engine in an overheated condition in the two months

---

[12] This cite is to SBC Alb's declaration.
[13] The Navy's initial Rule 4 included logs, mostly pre- and post-operation checklists, that the Board discovered were misidentified as FS logs. The Navy then supplemented the Rule 4 with FS logs (R4, tabs 75-81). The Navy therefore had ample opportunity to supplement the record with all of the engine logs it contends it filled out. However, many of the logs are missing.

13

before 6 August 2015. SBC Alb's 5 August 2015 email reporting that a mechanic told him FS may have a cracked manifold on the port engine indicates that the problem likely existed before the 6 August 2015 trip (finding 17). Overcoming the presumption requires a preponderance of the evidence. The Navy failed to explain why the missing engine logs were not consistently filled out or not entered into the record. The lack of engine logs between 27 May 2015 and 6 August 2015 proving that the Navy did not operate the port engine in an overheated condition, as it did before the first failure, tips the balance in favor of ATSCC. We cannot reconcile the testimony and the contention in the Navy's brief with the lack of engine logs in the record. The evidence in the record, "when fairly considered, produces the stronger impressions, and has the greater weight, and, even though not free of doubt, is more persuasive as to its truth when weighed against evidence in opposition thereto." *Jack Heller*, 72-2 BCA ¶ 9477 at 44,147. Therefore, we conclude the Navy failed to overcome the presumption that the FS engine failure was caused by its negligence by a preponderance of the evidence. We sustain ATSCC's claim for the damage to the FS's port engine in the amount of $39,645.88.

## CONCLUSION

For the reasons stated above we sustain the appeal in the amount of $50,637.08 plus CDA interest from 15 December 2015.

Dated: 3 October 2017

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result
(see concurring opinion)

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

I concur in the result. I respectfully disagree with the reasoning in Judge Clarke's opinion because I conclude that the terms of the contract, notably those in section 2.4 of the PWS, expressly require the contractor to prove negligence on the part of the government in order to recover. This requirement is inconsistent with the otherwise-applicable presumption from bailment law that the bailee is responsible for damages to the rented vessel unless proved otherwise. Nevertheless, I have carefully reviewed Judge Clarke's findings of fact and find that they and the record that they rely upon support his findings of government negligence, even without the presumption upon which Judge Clarke's opinion, in part, relies.

Dated: 3 October 2017

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61047, Appeal of Assessment and Training Solutions Consulting Corporation., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals